**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DR. ANN MARIE BEDDOE | ) | Civil Action No.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOUNT SINAI HEALTH SYSTEM, | ) | |
| INC., ICAHN SCHOOL OF MEDICINE | ) | |
| AT MOUNT SINAI, | ) | **JURY TRIAL DEMANDED** |
| and | ) | |
| DR. DENNIS S. CHARNEY, | ) | |
| | ) | |
| Defendants. | | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff DR. ANN MARIE BEDDOE ("Beddoe") by and through her undersigned attorney, complains of Defendants MOUNT SINAI HEALTH SYSTEM, INC., ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, and DR. DENNIS S. CHARNEY, (collectively, "Defendants") and in support respectfully alleges, upon information and belief, the following:

## NATURE OF THE ACTION

1. This action is brought for unlawful retaliation within a covered education program or activity pursuant to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et. seq.* ("Title IX"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, Executive Law § 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, NYC Admin. Code § 8-107 ("NYCHRL").

2.      This lawsuit centers on the workplace retaliation Dr. Ann Marie Beddoe suffered after she complained of discrimination by Dr. Prabhjot Singh ("Singh"), the then-Director of the Arnhold Institute for Global Health ("AIGH" or "the Institute") at the Icahn School of Medicine at Mount Sinai within Mount Sinai Health System, Inc. (collectively, "Mount Sinai").

## PARTIES

3.      Beddoe is an individual and is domiciled in the State of New York.  At all material times, Beddoe was an employee of Defendant Icahn School of Medicine at Mount Sinai, run by Defendant Mount Sinai Health System, Inc., her ultimate employer.

4.      Mount Sinai Health System, Inc. is a domestic not-for-profit corporation, duly organized and existing under the laws of New York, with offices at One Gustave L. Levy Place, New York, New York, 10029.  It is the ultimate parent of an integrated health care system encompassing the Icahn School of Medicine at Mount Sinai and eight hospital campuses in the New York metropolitan area.

5.      The Icahn School of Medicine at Mount Sinai is a private medical school, duly organized and existing under the laws of New York, with offices at One Gustave L. Levy Place, New York, New York, 10029.

6.      The Icahn School of Medicine at Mount Sinai is one of the top medical schools in United States and is led by its Anne and Joel Ehrenkranz Dean, Dr. Dennis S. Charney ("Charney"), who also serves as President for Academic Affairs at Mount Sinai Health System, Inc.

7.      Mount Sinai Health System, Inc. and the Icahn School of Medicine at Mount Sinai operate in an industry that affects commerce and employs twenty or more employees

each working day in more than twenty calendar weeks per year, qualifying as an employers for purposes of Title VII, the NYSHRL and the NYCHRL.

8.      Charney is an individual and is domiciled in the State of New York.  At all relevant times, Charney was employed by Mount Sinai.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*., and Title VII, 42 U.S.C. § 2000e *et seq*.

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims, as the claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*, Mount Sinai has its headquarters in this District, and a substantial part of the unlawful employment practices alleged below occurred in this District.

## ADMINISTRATIVE PROCEDURES

12.      On September 14, 2020, Beddoe filed a charge of retaliation with the EEOC as required by federal law.  On September 21, 2020, the EEOC issued Beddoe a notice of right to sue in respect of her claims asserted herein.

13.      That day, on September 21, 2020, Beddoe timely moved to join her claims herein with those asserted by the plaintiffs in *Atkinson et al. v. Mount Sinai Health System et al.*, Civil Action No. 1:19-cv-03779-VSB-JW ("Atkinson Litigation"), currently pending in this Court.

14.     On January 14, 2022, The Honorable Vernon S. Broderick denied Beddoe's motion, finding her claims insufficiently related to the other claims in Atkinson Litigation to allow for proper joinder.

15.     Beddoe has fully exhausted all applicable administrative remedies, and all prerequisites and conditions precedent of the filing of this action have been satisfied.

## SUMMARY

7.     Beddoe is an expert in global health and a highly successful oncologist at Mount Sinai.  Charney, Dean of the Medical School since 2007, is an outsized personality who runs it with an iron grip.

8.     Against the advice of a selection committee that included Beddoe, Charney appointed Singh, a 32-year-old medical resident, to run the prestigious Arnold Institute for Global Health.  In reviewing Singh's candidacy for the position, Beddoe had given Singh all "zeroes" on his evaluation sheet.  Singh, who had overstated his qualifications, then exaggerated what he was accomplishing at AIGH, and systematically drove out the women (particularly older women) who had made its international reputation.  Those women, friends and work allies of Beddoe's, finally complained to Mount Sinai about the hostile environment Singh was creating.

9.     During the ensuing investigation, Beddoe again told Charney that Singh was subpar, and that he pervasively discriminated against women at AIGH.  A few days later, again supporting these women, she wrote Charney that if the investigation gave Singh a pass for his discriminatory behavior, it would be a "Rubicon" moment for Mount Sinai.  Charney never responded to her note, and chose to back Singh, who remained head of AIGH after the conclusion of the investigation.

10.     The women Singh had discriminated against then sued Mount Sinai in the Atkinson Litigation, landing Beddoe on Charney's bad side.  After Singh resigned, senior

figures at Mount Sinai asked her interest in assuming portions of Singh's job; as soon as Charney was consulted, those discussions stopped.  Moreover, the next time Beddoe's contract was up for renewal, the compensation offered was dramatically reduced.  The reasons given were false, inconsistent, and nonsensical.  Ultimately, Charney controlled her compensation and vindictively cut her pay because of her opposition to both Singh's discriminatory practices and Charney's acceptance of them.

## GENERAL ALLEGATIONS

### Beddoe's career at Mount Sinai

11.     Born in Trinidad and Tobago, Beddoe emigrated to the United States in the late 1960s.  She received her MD from State University of New York, Downstate Medical Center College of Medicine and completed her residency in Obstetrics and Gynecology at State University of New York, Health Science Center at Brooklyn.  After her residency, she undertook a fellowship in Gynecologic Oncology at State University of New York, during which she received specialized training in women's cancers, surgery, chemotherapy and medical care.  She additionally completed a fellowship in Clinical Nutrition from Memorial Sloan Kettering and received her MPH in Global Health from New York University.

12.     Beddoe is an accomplished researcher with dozens of publications related to obstetrics, gynecology and oncology with a focus on addressing disparities in cancer care for women around the globe.  Her research centers on developing countries, specifically Liberia, South Africa, Colombia and the Dominican Republic, where she has spent a significant amount of time researching and raising awareness of cervical and other gynecologic cancers, as well as providing reproductive health care to sexual and religious minorities, including LGBTQ and sex-worker communities in Liberia and South Africa.

Beddoe is the co-founder of The Women Global Cancer Initiative, a not-for-profit organization whose mission is to ensure equitable cancer care for women. She worked at Mount Sinai on and off for 25 years and assumed a full-time position in 2013 as an Assistant Professor in the Department of Obstetrics, Gynecology and Reproductive Science, Division of Gynecological Oncology, focusing on the administration of chemotherapy for the hospital's gynecology patients.

13.     In 2017, Beddoe received promotion to Associate Professor. She was also serving as the Director of Global Women's Health and Director of the Global Women's Health Fellowship Program at the Icahn School of Medicine at Mount Sinai.

## Director search for the Arnhold Institute for Global Health

14.     Mount Sinai's global health efforts were spearheaded in the mid-2000s by Dr. Ramon Murphy ("Murphy"), an eminent pediatrician, who led a group of physicians including Dr. Natasha Anushri Anandaraja ("Anandaraja") and later Dr. Holly Atkinson ("Atkinson") in building a unique Global Health Training Program. Over time, the program became known as Mount Sinai Global Health ("MSGH") and was put under a new Dean for Global Health, Dr. Phil Landrigan ("Landrigan").

15.     By 2013, MSGH's work was so well-regarded that it attracted serious attention from two influential foundations in New York City, both run by the Arnhold family: the Arnhold Foundation and the Mulago Foundation (together, "the Foundations"). Murphy had known the Arnholds for decades as the family's chosen pediatrician. He and other MSGH doctors had briefed the family on its work over the years, and they had made periodic donations. In 2013, the Arnhold family decided to sharply expand their support, making a major $12.5 million donation (split between the Foundations).

16.     The terms of the donation dictated that Mount Sinai "upgrade" MSGH to a formal institute, AIGH. Mount Sinai announced the name change on April 3, 2014.

Landrigan became AIGH's Interim Director to oversee the Institute while an international search found a permanent director.  The Institute moved into new offices in summer 2015.

### Charney forms a search committee

17.     After receiving the Foundations' donation, Charney formed a search committee to pick the inaugural AIGH Director.

18.     Charney's direct oversight of the search process showed that the AIGH Director position was a high priority.  He appointed Landrigan chair of the search committee, joined by Beddoe, Murphy, Dr. David Muller (Dean for Medical Education) ("Muller"), Dr. Michael Brodman (Chair of Obstetrics, Gynecology and Reproductive Science) ("Brodman"), Dr. Adolfo Garcia-Sastre (Director of Global Health and Emerging Pathogens Institute), and Dr. Jo Ivey Boufford (President of The New York Academy of Medicine and Clinical Professor of Global Public Health at New York University).

19.     Landrigan exchanged several e-mails with MSGH staff about an appropriate job description, ultimately approving the following:

> The Icahn School of Medicine at Mount Sinai seeks an experienced MD, PhD, Dr.P.H, or person with equivalent training to lead a newly endowed Institute for Global Health. Our ideal candidate is a person with well-recognized leadership skills, a scholarly portfolio that includes current grant funding and a strong publication record, and an approach to global health which fosters interdisciplinary collaboration, partnership and innovation[.] We are looking for an inspirational team leader with field experience in low and middle income countries, a grounding in public health and health education, and a demonstrated commitment to serving under-resourced and neglected populations.

20.     The search committee agreed to limit candidates to those at Associate Professor level or above, with a "scholarly portfolio that includes current grant funding and a strong publication record" in global health.  It narrowed the large application pool to a shortlist of ten scholars, each of whom met the criteria.  Some had more than 100 publications and ran their own departments and institutes elsewhere.  After considering the shortlist, the committee (including Beddoe) settled unanimously on a formidable

frontrunner, the female head of a global health program at a major university, and recommended to Charney that he hire her.

21.     However, on information and belief, when Charney reviewed a proposed budget for her position presented by Landrigan and Murphy, Charney screamed at them, threw the budget down on the table, pounded it with his fist and called it "ridiculous," though they considered it reasonable for a newly elevated AIGH.  Despite further budget negotiations, Charney ultimately wrote the female candidate an e-mail calling her "AN IDIOT," in red font and all capitals, and she withdrew her application.

### Charney instructs the search committee to consider only Singh

22.     Charney instructed the committee to pick someone else, but quickly put forward his own candidate, Singh.

23.     Beddoe was astonished.  Singh was just a 32-year-old medical resident and was vastly less qualified than the other candidates.  He had some promise in global health; he had been a Visiting Assistant Professor of International and Public Affairs at Columbia and Director of System Design at the Earth Institute, where he worked with Professor Jeffrey Sachs to co-found the One Million Community Health Workers Campaign in 2013. He was also a 2012 Robert Wood Johnson Foundation Young Leader and a Fellow of the Committee on Global Thought at Columbia.   But he had no notable management experience, publication record or grant history, nothing commensurate with running a major center at a prominent medical school.  He had come to Mount Sinai as a resident in 2011 but had even not completed his medical training when Charney decided he should be AIGH Director.

### Singh formally visits AIGH

24.     After Charney ordered the search committee to consider Singh, Landrigan had no choice but to comply.  Landrigan instructed his executive assistant to organize "a

full day of interviews and a seminar [for Singh] as a candidate for the position of Director of [AIGH]."  Singh's official interview, lecture and visit to AIGH was on December 16, 2014.

25.     After his lecture, the audience asked him several questions that he seemed to have trouble with, including one from Beddoe: "What do you see as the most important problem in global health that we will face in the upcoming years?"  Singh gave an unfocused answer.

26.     He came across to several attendees, including Beddoe, as unprepared and underqualified, a charismatic young man ill-equipped to run the Institute.

27.     Singh sure talked the talk.  After the lecture, Singh boasted to Beddoe that he had extensive contacts in Liberia, including the country's President, and said he could put her in touch with some of them if it would be helpful.  Beddoe had her own Liberian contacts from her prior work, and when they began to discuss specific names, Singh suddenly fell silent, leaving her with the impression that in fact he did not have the contacts he had claimed to, and was worried that this might be exposed if the conversation continued.

***Singh was underqualified and inflated his CV***

28.     Members of the search committee submitted evaluations to Landrigan after Singh's visit.  Several of them made it clear that they regarded him as clearly unsuitable. Beddoe gave him a score of zero on virtually all the search committee's metrics.  When she submitted her scores to Landrigan, he asked if she really wanted to score Singh in this manner.  Beddoe replied that it was an appropriate assessment for someone who was clearly not qualified for the position.

29.     All zeros was not an unreasonable score for him on the committee's metrics.

30.     High-level appointments such as the director of a major global health institute, normally will have dozens of peer-reviewed, original research articles.  Singh's CV at the time showed very few publications, and none contained original global health research; he wrote mostly opinion pieces.

31.     Singh also had no federal grants, usually a given for reputed researchers and a requirement for high-level positions overseeing research.  Singh's funding came primarily from private foundation grants regarded as less prestigious than the standard R01 grants from the National Institutes of Health.

32.     Moreover, the CV Singh submitted to the search committee repeatedly overstated his credentials.  For example, he stated that he was an Assistant Professor at Columbia University when, on information and belief, he was in fact a Visiting Assistant Professor.

33.     Singh also misrepresented his publication record by using non-standard formatting not used by Mount Sinai and exaggerated his funding by implying others' grants were his own.

### *Despite lack of qualifications, Charney hires Singh*

34.     Nevertheless, Charney evidently thought Singh was a remarkable find and that choosing him was a coup.  On February 2, 2015, he met with the Institute's Advisory Board, which included many of its major donors, to tell them Singh was his choice.

35.     This confused many members since there seemed no objective explanation for the selection.  They noted Singh's lack of experience and asked how and by whom he would be supervised.  Charney grew annoyed by their challenges and offered only curt replies; he said he would supervise Singh personally and meet with him weekly.  Charney's focus seemed to be on quieting the Advisory Board so that he could get his way.  Shortly thereafter, he sent an e-mail to the school announcing Singh's new position.

36.     Charney's infatuation with Singh was so total that this 32-year-old junior scholar was not only given the reins at AIGH but also a position as Vice Chair in the Department of Medicine.

## Beddoe's subsequent experiences with Singh

### Singh rejects Beddoe's proposal for funding a global oncology program in Liberia

37.     After Singh assumed his position at AIGH, Beddoe approached him about funding for a global oncology program she was developing in Liberia.  Beddoe had worked extensively in Liberia, but hoped to form a new partnership between Mount Sinai, AIGH and Liberian hospitals to further local oncology research and care.

38.     The partnership fit perfectly with the goals and mission of AIGH, and Beddoe was optimistic about securing funding.  But Singh was dismissive, showing no interest in her proposal or how it could benefit AIGH.  He denied her funding request.

### Singh later wants to be involved in Liberia efforts

39.     Shortly after this meeting, upon information and belief, Charney informed Singh that AIGH should be involved in more global health sites.  Suddenly, Singh reconnected with Beddoe and asked her to join him on a networking trip in Liberia to introduce him to her contacts there.

40.     During the trip, despite his boasting at his job interview, Beddoe quickly saw that her connections in Liberia were far more extensive and impressive than Singh's.

41.     As the trip progressed, Singh's demeanor changed.  Having initially insisted attending every item on the agenda, he soon chose to skip many of them.  Notably, during a dinner with AIGH's grant partners, almost all of whom were women, Singh announced loudly: "We should have sat this one out."

42.     Nonetheless, when they debriefed with the entire team on the return to New York, Singh expressed interest in Liberia and stated to the team that he was asked to oversee the implementation of the ATLAS project he was working on.  This did not align with Beddoe's recollection of the meetings in Liberia, and so she told the team that the implementation of the ATLAS project in Liberia was not in fact discussed.  Singh responded that he had received a personal call from the Minister of Health of Liberia with this request (Beddoe's contacts at the ministry did not corroborate this to her subsequently).  Despite this clear disconnect, Singh nonetheless ended the meeting on a positive note, hoping to finally implement the ATLAS project.

43.     Singh subsequently invited Beddoe to have a secondary faculty appointment at the newly formed Department of Health System Design and Global Health at Mount Sinai. When Beddoe asked what teaching commitments were involved, and whether her department would be compensated for her activities, Singh responded that there would be no commitments or benefits; he said that he just wanted names of respected academicians to put on the department's website. Beddoe said she was not interested in her name being used in this way unless she taught or conducted research for the department. At that meeting Beddoe again pressed Singh for a financial commitment to Liberia. This annoyed Singh who abruptly terminated the meeting, and subsequently openly announced to the AIGH staff that "Liberia was off."

44.     Singh later criticized Beddoe to an AIGH employee, Amanda Misiti ("Misiti").  When talking about Beddoe, Singh asked Misiti, "Do you know what splitting is?", which she understood to be an (inflammatory and unfounded) insinuation about Beddoe's mental health, i.e., that Beddoe suffered from a Cluster B personality disorder, such as borderline personality disorder.  Misiti was offended by the remark, and inferred

that Singh was twisting things to avoid accepting that it was he, not Beddoe, who had made their relationship difficult.

### Beddoe flags concerns about Singh's leadership during a meeting with Charney

45.    After the trip to Liberia, Beddoe pitched her Liberian oncology program directly to Charney, hoping he would agree to fund it.  Charney said she had to submit her proposal to Singh for funding.  When Beddoe explained that Singh had already refused, Charney told her to ask Singh again and return to him if she encountered any issues.

46.    Beddoe acceded but told Charney she held broader concerns about Singh and his leadership of the Institute.  Anandaraja and Atkinson, experienced doctors with excellent reputations, had shared with her many examples of sexist behavior by Singh. Combined with Singh's insufficient knowledge of global health, his baseless name-dropping, and his general penchant for untruth, Beddoe told Charney that Singh oversold himself and exaggerated his accomplishments, but Charney shrugged off these concerns.

### Mount Sinai's investigation of Singh

47.    In April 2018, Anandaraja and Atkinson formally reported Singh's mismanagement of AIGH and discrimination against women to Clarissa Jones-Winter ("Jones-Winter"), Director of Employee Relations.  Mount Sinai investigated, led by Jones-Winter, Marina Lowy ("Lowy"), Senior Associate General Counsel, and Caryn Tiger-Paillex, Director of Human Resources.   In May 2018, the investigative committee interviewed at least 13 current and former employees of AIGH, including Beddoe.

48.    Beddoe was interviewed by Lowy for 20-30 minutes, during which Beddoe described her concerns about Singh, including his hostile approach to women and the incompetent performance she had seen since the start of his tenure, and emphasized that complainants had raised valid concerns.  Beddoe said she had heard their accounts of his discrimination and chaotic management since his arrival at AIGH.  Lowy challenged her,

telling Beddoe that if she had not personally experienced discrimination, her concerns were mere hearsay.

49.     Appearing to justify Singh's actions, Lowy told Beddoe that when she was a young lawyer in Israel, she herself had experienced treatment similar to what the complainants described and did not understand why they were raising it; the clear implication was that they should simply accept Singh's misconduct.   That the "independent" investigator made this comment troubled and offended Beddoe.

50.     Lowy said she had asked Singh about some of the allegations, and he had denied them.   She concluded by saying that Beddoe and the complainants "may not be happy" with the outcome of the investigation.   Beddoe was confused as to how Lowy could know the outcome when it was not over, and inferred either that Lowy had prejudged the outcome or that Charney had already decreed it.   Beddoe was so concerned by Lowy's comments that she decided to speak to Charney directly.

### Beddoe complains to Charney

51.     Beddoe soon requested a meeting with Charney ostensibly to revisit her global oncology program.   At the meeting, she updated him on the status of the program before asking Charney if he had a few extra minutes to discuss an unrelated matter.   Beddoe explained that she was coming from a good, positive place towards him and Mount Sinai, which is why she wanted to raise concerns about the internal investigation into Singh. Beddoe told Charney she hoped he would not be offended by the topic because she knew of his reputation of yelling at people when discussing uncomfortable topics, and she did not want to be yelled at.

52.     Charney appeared stunned to hear that he had the reputation for ill temper, but allowed her to proceed.   Beddoe repeated that she felt Singh had consistently

demonstrated he was not fit to run the Institute, and that he had discriminated against multiple women at AIGH; and said she had concerns with the integrity of the investigation.

53.     Beddoe elaborated, explaining that Singh had verbally and emotionally abused his female colleagues: that his denigration of them could be subtle but was persistent, and that he regularly veered between normal office politeness and cruelty which she thought that Charney, as a psychiatrist, would recognize as pathological.  She also said that if the investigation cleared him of all misconduct, she worried he would feel emboldened and his abuse would become more overt.

54.     Charney replied that he knew of no concerns about Singh's conduct until they had been raised by Atkinson, Anandaraja, and others, prompting him to order the internal investigation.  Charney claimed that he was a champion for women and women's rights, that he himself had daughters, and that he had supported the women who complained about Singh.

55.     Charney asked Beddoe if she believed that Singh could be rehabilitated.  She said she did not think so.  Charney said he believed that Singh "had potential" and should be given a chance to develop it.  Beddoe agreed that Singh had potential but asked, "What about the potential of the women Singh has mistreated?"  Charney had no response.  Charney ended by stating that he would follow whatever recommendations resulted from the internal investigation.  Given Lowy's implication that Charney had already determined the investigation's outcome, Beddoe was not comforted.

56.     The following week, Beddoe heard rumors that the investigation had exonerated Singh and the outcome was about to be announced.  Still hoping Charney would listen, Beddoe wrote him on June 23, 2018:

> Dear Dean Charney,
>
> I want to once again thank you, now personally, for meeting with me last week. I was encouraged by our conversation and left with the profound feeling that Mount Sinai would go down in history as an academic institution that would show "zero tolerance"

for emotional abuse and harassment of women by men in leadership positions at our medical center.

Sadly there have been numerous rumors heralding your announcement this week that range from appointing an oversight committee that would monitor the person alleged to have committed these offenses, while leaving his position intact to removing him from his current leadership role but protecting his career within the confines of our great institution. None of the rumors however hinted of his complete removal from the institution with assurances that Sinai would never condone even the perception of abuse to women.

This has consumed my thoughts and has given me sleepless nights: that you may be even entertaining putting one man's career over multiple women who been mentally and emotionally scarred. I believed you when as we discussed you said that you did not know this was taking place at our institution. But now you do know and you will be judged by this very important decision. It will be the true test of Mount Sinai's values in the field of diversity and tolerance of bullying.

I have conveyed to some of the women the sentiment that you expressed in full support and value of women; but any action by our leadership that serves to protect men in power would undermine those sentiments and would send a profound message not just to these women but to all women on campus that Sinai does not have the "backs" of women but that the careers of men in power are of utmost importance to the institution and that their careers must be protected.

From deep in my heart I pray that you make the right decision. This is our institution's "Rubicon."

Respectfully,
Ann Marie Beddoe

57.     Charney never replied to Beddoe's e-mail.


## Charney retaliates against Beddoe

58.     From the start of Singh's recruitment and hiring, Beddoe told Charney, Lowy and other senior Mount Sinai administrators that he was underqualified, that he discriminated against, targeted and bullied the women who worked for him, and that the internal investigation into his discriminatory misconduct was one-sided and predetermined. In March 2019, she provided testimony to the plaintiffs in the Atkinson Litigation reiterating these views, which was reflected in their Complaint.

59.     That Complaint was a major embarrassment to Mount Sinai.  It prompted hundreds of students, alumni, and even current employees working for Charney to sign letters supporting the Atkinson plaintiffs and criticizing a culture of bullying and systemic

downgrading of women under his leadership.  It was a major factor in the City Council of New York's decision to establish a Gender Equity Advisory Board to monitor the city's hospitals.

60.     Defendants have retaliated against Beddoe and continue to retaliate against her for her opposition to discrimination in the Icahn School of Medicine at Mount Sinai.

**_Beddoe is told she would be considered for a new role within Global Health, yet never hears back after her interview_**

61.     On July 3, 2019, after the Atkinson Litigation became public, Charney informed the Medical School that Singh had "chosen to step down" as Director of AIGH and Chair of the Department of Health System Design and Global Health, though he remained an Associate Professor at Mount Sinai.  In his notice, Charney thanked Singh for his "dedicated work as Chair and Director," and praised his "devotion to [the school's] mission and success."  In a separate statement issued through a public relations consultant, not contradicted by Mount Sinai, Singh proclaimed that he was able to "step aside . . . knowing that the attacks on [his] integrity and . . . work have been investigated and proven false."

62.     After Mount Sinai announced Singh's resignation, Beddoe heard that Dr. Rachel Vreeman ("Vreeman"), the newly appointed Interim Chair of the Department of Health System Design and Global Health and Director of AIGH, was being considered as Singh's permanent replacement.  Beddoe was thrilled; she thought Vreeman was a very good choice and was certainly qualified to lead AIGH.

63.     However, in around September 2019, Leslie Schneider contacted Beddoe and several others on behalf of Dr. Annetine Gelijns ("Gelijns").  Schneider said that Gelijns was chairing the new committee responsible for finding Singh's replacement as

Director of the Institute and Chair of the Department of Health System Design and Global Health.  She scheduled a call for the following week.

64.    On the call, Gelijns and Schneider sought advice about what the roles entailed and what Mount Sinai should do differently this time around.    Beddoe recommended that Mount Sinai go through a serious recruitment process, unlike Charney's unilateral choice to hire Singh, and suggested a couple of candidates from the previous recruitment process for Gelijns to consider.

65.    On October 25, Gelijns e-mailed Beddoe and asked whether, in light of her "experience and stature in the field of global health," she might be interested in applying for the Director position.  Beddoe responded that her global health commitments and ongoing clinical research would prevent her from taking the position, but that if the role were divided into two positions—the Chair of the Department of Health System Design and Global Health and the Director of the Institute—held by two separate individuals, she would be delighted to take on the Director role.  Gelijins expressed cautious optimism and then requested a face-to-face meeting to discuss this idea.

66.    During that meeting, Gelijns and Beddoe discussed how the current leadership and management team could be improved.  The following week, Gelijns told Beddoe by e-mail that she had "learned a lot from [their] conversation," and that she had "conveyed [Beddoe's] views to … Charney."

67.    In a subsequent phone call, Gelijns stated that she would be meeting with Charney to discuss Beddoe's proposal to split the position between two individuals and recommend Beddoe to the Director role.  Gelijns said she would get back to her shortly.

68.    Beddoe never heard from Gelijns about the role again, despite following up with her several times.  Nor did she hear from Charney.

***Beddoe's pay is cut***

69.     In February 2020, Beddoe's three-year employment contract with the Icahn School of Medicine at Mount Sinai was up for renewal.  The previous contract had been renewed by Charney on February 1, 2017, designating Beddoe as an Assistant Professor in the Department of Obstetrics, Gynecology and Reproductive Sciences, Member of the Medical Staff, and Director of Gynecologic Oncology Chemotherapy Infusion Service and System Director of Global Health.  The contract granted Beddoe an annual base salary, clinical supplement, and administrative supplement.

70.     On February 12, 2020, Beddoe received an offer letter from Charney and her Department Chair, Michael Brodman, to remain at Mount Sinai for another three years, but with some important changes to her previous terms.  Her 2020 compensation was to be $50,000 less than her annual compensation under the 2017 contract; her 2021 compensation would be cut by an additional $50,000, and her 2022 compensation would shrink another $50,000, so that her total compensation would decrease $300,000 over the three-year term. In addition, her Director of Chemotherapy title was being removed.

71.     Beddoe's administrator said that the title change was responsible for the salary cut.  Beddoe replied that she had never been compensated for this role, so its removal should not affect her compensation.  Her administrator referred her to Brodman.

72.     Brodman told her a different story, that her salary was being cut because she had not brought in sufficient revenue.  Beddoe asked for her billing records to verify this. Brodman asked for a list of her patients, which she provided for a 14-month period.  But he also told her that his hands were tied regardless because Charney controlled her salary.

73.     Brodman also asked Beddoe about the status of her application for the role of Director of the Institute, and said that if she got that role, she would not feel the impact of the pay cut.

74.    During a follow-up meeting in March 2020, Brodman failed to provide Beddoe with her billing records for the patients she had identified, and asked her to resubmit the list, which she did.

75.    In June and July 2020, Beddoe finally received some data about her patient billings, but it was obviously inaccurate and incomplete.  For example, it excluded bills that Mount Sinai submitted to insurance companies for her work as well as the companies' usual Explanation of Benefits, which would show what Mount Sinai had recovered for the billed amounts.  Without this information, any analysis was meaningless, and any argument that she had been earning the hospital less than in previous years was unfounded.  The data provided were clearly not a serious effort to assess the income Beddoe had earned for Mount Sinai.  The explanation for reducing her pay based on allegedly lower billings thus appeared to be pretextual.

76.    Nevertheless, facing an expired contract, Beddoe reluctantly acceded to a $50,000 reduction on a one-year agreement, although Brodman and Charney had still not justified the pay cut.  In May 2021, Beddoe reluctantly agreed to a new contract with an overall compensation/salary reduction of $100,000.

77.    Colleagues from AIGH have told Beddoe that they believe her pay was cut in retaliation for expressing concerns about Singh and the internal investigation in June 2018.

78.    Mount Sinai's decision to cut Beddoe's salary has significantly and directly harmed her.  So has its refusal to consider her for internal promotions, including by depriving her of opportunities she could use to secure external appointments.  Mount Sinai's actions have also caused Beddoe emotional distress.  In particular, Charney's retaliation has inflicted an immense toll on her sense of self-worth and depleted the energy and enthusiasm she once brought to her work at Mount Sinai.

## CLAIM FOR RELIEF

### RETALIATION–TITLE IX, TITLE VII, NYSHRL and NYCHRL

79.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

80.    At all relevant times, Beddoe was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

81.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

82.    Through the Icahn School of Medicine at Mount Sinai, Mount Sinai Health System, Inc., provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

83.    On information and belief, Mount Sinai receives financial assistance from the United States government for educational purposes.

84.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine at Mount Sinai and President for Academic Affairs at Mount Sinai Health System, Inc., had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced retaliatory acts against Beddoe.

85.    On numerous occasions during her employment at Mount Sinai, Beddoe voiced opposition to workplace discrimination, most prominently in June 2018 when she confronted Charney about Singh's discrimination against women at AIGH.  The following week, on June 23, Beddoe sent an e-mail to Charney calling for him to take responsibility for the discriminatory environment in AIGH by relieving Singh of his duties as Director.

86. Beddoe's call for Charney to take remedial action and her contributions to the investigation of the discrimination claims asserted in this matter constitute protected activities under Title IX, Title VII, the NYSHRL, and the NYCHRL.

87. In October 2019, despite the support of senior members at AIGH, Defendants took adverse action against Beddoe when they refused to consider her candidacy for Director of AIGH.

88. On or about February 12, 2020, at their first opportunity to do so, and subsequently, Defendants took adverse actions against Beddoe by progressively reducing her annual compensation from amounts previously set by contract.

89. Defendants' adverse actions against Beddoe could well dissuade a reasonable employee from making or supporting a charge of discrimination.

90. But for her participation in these protected activities, Defendants would not have taken adverse action against Beddoe.

91. As a result of Defendants' retaliatory actions, Beddoe has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, mental anguish, stress, and emotional distress. As a result of those actions and consequent harms, Beddoe has suffered such damages in an amount to be proved at trial.

92. Beddoe requests relief as described in the Prayer for Relief below.

## **DEMAND FOR JURY TRIAL**

93. Plaintiffs respectfully demand a trial by jury as to all matters so triable pursuant to Fed. R. Civ. P. 38.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Beddoe respectfully demand judgment against Defendants Mount Sinai Health System, Inc., Icahn School of Medicine at Mount Sinai and Charney, awarding:

(a)   Damages in amounts to be established at trial, including without limitation, damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish and physical injuries, compensation for harm to reputation, loss of past, present and future enjoyment of life, and past and future lost earnings and earning capacity, and out-of-pocket expenses, punitive damages and liquidated damages;

(b)   Attorney's fees, costs and expenses authorized by 42 U.S.C. § 1988, the NYSHRL and the NYCHRL;

(c)   Pre- and post-judgment interest; and

(d)   Such other and further relief as the Court may deem just and proper.

Dated: April 13, 2022

Respectfully submitted,

BY: /s/ John F.O. McAllister

John F.O. McAllister
McALLISTER OLIVARIUS
641 Lexington Avenue, 13th Floor
New York, New York 10022
(212) 433-3456
jmcallister@mcolaw.com

*Attorney for Plaintiff*