UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. ANN MARIE BEDDOE<br><br>       Plaintiff,<br><br>   -against-<br><br>ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI and DR. DENNIS S. CHARNEY<br><br>       Defendants. | Case No. 1:22-cv-03080 (JLR)<br><br>**ORDER** |

JENNIFER L. ROCHON, United States District Judge:

  Dr. Ann Marie Beddoe ("Beddoe" or "Plaintiff") brings this action against her former employer, the Icahn School of Medicine at Mount Sinai ("Icahn"), and Icahn's dean, Dr. Dennis S. Charney ("Charney" and, together with Icahn, "Defendants"). ECF No. 1 (the "Complaint" or "Compl."). Plaintiff alleges that she was subject to retaliation for speaking up against gender-based discrimination at Icahn, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* (the "NYCHRL"). Compl. ¶ 1.

  Now before the Court is Defendants' motion for summary judgment. ECF No. 72 ("Br."). For the following reasons, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's Title IX, Title VII, and NYSHRL claims. Plaintiff's NYCHRL claim is dismissed without prejudice.

# BACKGROUND

I. Facts

### A. Plaintiff's Employment at Icahn

Charney has been the dean of Icahn since 2007. ECF No. 81 ("Opp. SOF") ¶ 1. Icahn is a private medical school located in New York, New York. Compl. ¶ 5. Beddoe is a gynecologic oncologist, who, until this lawsuit, worked at Icahn. Opp. SOF ¶¶ 2, 63. Before Beddoe joined Icahn, she worked in a private practice called "Group for Women" with her husband, Dr. Peter Dottino, and Dr. Rudy Segna. *Id.* ¶¶ 2-4. Beddoe, Dottino, and Segna all joined Icahn in 2013. *Id.* ¶ 14. After they joined Icahn, Beddoe, Dottino, and Segna continued their practice at 800 Fifth Avenue (the "Fifth Avenue Facility"). *Id.* ¶ 14. Dr. Segna left the practice in 2017. *Id.*

### B. The 2013 Contract

Beddoe's original employment contract with Icahn (the "2013 Contract") provided for a three-year appointment as a full-time faculty physician. *Id.* ¶ 5. Beddoe was hired as an Assistant Professor in the Department of Obstetrics, Gynecology and Reproductive Services (the "Department"), and she held the administrative title of Director of Gynecologic Oncology Chemotherapy Infusion Service. *Id.* The 2013 Contract provided Beddoe with a fixed annual compensation of $566,399 for the first two years of her employment. *Id.* ¶ 7.

### C. The 2017 Contract

Beddoe's 2013 Contract was renegotiated in 2017. *Id.* ¶ 22. Icahn's records reflected that in 2014, Beddoe posted receipts of $530,040.58 and had productivity of 1,044.35 Revenue Value Units ("RVUs").[1] *Id.* ¶ 24. Icahn's records also show that in 2015, Beddoe posted receipts of

---

[1] RVUs are a "measure of productivity [i]n the clinical setting," tied to standard codes used in medical-billing settings. Opp. SOF ¶ 18. The parties agree that RVUs objectively measure the effort, skills, and time a doctor devotes to a service rendered in a clinical setting. *Id.*

$244,948.47 and had productivity of 609.82 RVUs, and that in 2016, she posted receipts of $255,832.55 and had productivity of 482.79 RVUs.  *Id.*

Beddoe accepted a new three-year contract in March 2017 (the "2017 Contract").  *Id.* ¶¶ 25-27.  The 2017 Contract set her annual compensation at $432,912.  *Id.* ¶ 28.  Beddoe would hold the title of Assistant Professor in the Department, as well as the administrative positions of Director of Gynecologic Oncology Chemotherapy Incursion Service at Mount Sinai's Downtown Chelsea Center and System Director of Global Health.  *Id.* ¶ 27.

Also in 2017, Beddoe's chemotherapy practice moved to Mount Sinai's Chelsea Cancer Center (the "Chelsea Facility").  *Id.* ¶ 30.  Andres Licari, the Department's Director of Finance, managed Beddoe's billing at the Chelsea Facility.  *Id.* ¶¶ 21, 31.  Beddoe also continued to practice out of the Fifth Avenue Facility for "regular GYN" services, for which she used a separate billing company.  *Id.* ¶ 21.

Icahn's billing records show that for 2017, Beddoe's work at the Fifth Avenue Facility and the Chelsea Facility resulted in combined receipts of $99,064 and productivity of 263.04 RVUs.  *Id.* ¶ 34.  For 2018, those figures were $36,706.51 and 234.87 RVUs, and for 2019, those figures were $17,497.70 and 246.96 RVUs.  *Id.*  According to Icahn's records, Beddoe's RVU-based productivity, compared to Icahn's standard benchmarks, measured at the zero percentile in 2019.  *Id.* ¶ 35.

### D. Plaintiff's 2018 Promotion

In September 2016, the Department endorsed Beddoe for promotion to Associate Professor.  *Id.* ¶ 74.  At that time, the Department informed Beddoe that the promotion process could take up to a year due to Icahn's backlog of appointments and promotions.  *Id.*

Beddoe emailed her supervisor on April 23, 2018, expressing disappointment that the promotion had been pending for so long.  *Id.* ¶ 75.  On May 8, 2018, the supervisor informed

3

Beddoe that her application was lost and that he would attempt to expedite it.  *Id.* ¶ 76.  On December 4, 2018, Beddoe's promotion was approved and her title changed from Assistant Professor to Associate Professor.  *Id.* ¶ 77.

### E.  Complaints about Dr. Singh at Icahn

In 2015, Icahn hired Dr. Prabhjot Singh ("Singh") as Director of the Arnhold Institute for Global Health ("AIGH") and Chair of the Department of Health Systems Design and Global Health.  *Id.* ¶ 64.  In April 2018, two former Icahn employees, Dr. Holly Atkinson ("Atkinson") and Dr. Natasha Anandaraja ("Anandaraja"), made complaints of gender discrimination against Singh.  *Id.* ¶ 66.  Icahn investigated the complaints, during which its legal counsel spoke with Plaintiff about the complaints.  *Id.* ¶¶ 66-67.

On June 20, 2018, Beddoe met with Charney, and told him, among other things, that she thought Singh was "incompetent," "rash," and "denigrate[d] the women."  *Id.* ¶¶ 68-69; *see id.* ¶ 201.  On June 23, 2018, Beddoe emailed Charney about Singh, stating, among other things, "that [the notion that Charney] may be even entertaining putting one man's career over multiple women who have been mentally and emotionally scarred" "has consumed [her] thoughts and has given [her] sleepless nights."  *Id.* ¶ 72.  On December 13, 2018, Anandaraja met with Charney.  *Id.* ¶ 207.  During that meeting, Charney referenced Beddoe's June 23, 2018 email, and said it made him "angry when people suggest that [he is] not a champion of women."  *Id.*  On May 16, 2019, Beddoe signed an open letter to Mount Sinai's Board of Trustees opposing gender discrimination.  *Id.* ¶ 208.

On July 3, 2019, Singh resigned from Icahn.  *Id.* ¶ 79.  Charney named Dr. Rachel Vreeman as an interim replacement while Icahn searched for a new candidate to assume Singh's position.  *Id.* ¶¶ 79-81.

4

On October 24, 2019, Plaintiff spoke at an event at the New York Academy of Medicine regarding the "pervasive culture of discrimination in New York's healthcare institutions, including Mount Sinai." *Id.* ¶ 209.

### F. The Draft 2020 Contract

In December 2019, the Department began considering renewal of Beddoe's 2017 Contract. *Id.* ¶ 36. Members of the Department identified a $1.3 million deficit in Beddoe and Dottino's practice. *Id.* ¶ 37. Jodi Cohen, the Senior Vice President of Business and Strategic Planning, thereafter recommended reducing both Beddoe's and Dottino's salaries. *Id.* Following discussions, Plaintiff asked Dr. Brodman, one of her supervisors, if he would consider a two-year contract for her and Dottino "without any changes to the existing contract." *Id.* ¶ 44. Instead, on March 3, 2020, a draft three-year contract (the "Draft 2020 Contract") was provided to Plaintiff, which would have become effective as of March 1, 2020. *Id.* ¶ 46. The Draft 2020 Contract included a "glide-path" reduction of Plaintiff's total annual compensation, over three years. *Id.* ¶ 47. The Draft 2020 Contract would have reduced Plaintiff's annual compensation to $385,448 in year one, $335,448 in year two, and $285,448 in year three. *Id.* Although Plaintiff did not execute the Draft 2020 Contract, she was informed on April 28, 2020 that the reduced salary proposed under the Draft 2020 Contract would go into effect on May 1, 2020; on that day, the reduction became effective. *Id.* ¶¶ 48-50.

Beddoe met with Brodman on May 7, 2020, and wrote in an email that the salary cuts were not aligned with her productivity, because the bills generated at the Chelsea Center did not account for her patients being treated for chemotherapy. *Id.* ¶ 51. Brodman responded that the Department would draw up a one-year contract and compare her list of patients to what was in Icahn's system. *Id.* ¶ 52. Beddoe subsequently gave the Department a list of chemotherapy patients that she saw from January 2019 through April 30, 2020. *Id.* ¶ 53. The Department

5

analyzed the records and emailed Beddoe a summary of its review, which indicated, among other things, that Beddoe had posted receipts of $1,757.19 for February 2020.  *Id.* ¶ 54.

On July 28, 2020, Beddoe executed a new, one-year contract, dated July 27, 2020 (the "2020 Contract"), which awarded her an annual compensation of $385,448, as proposed under the Draft 2020 Contract.  *Id.* ¶¶ 60-61.

### G. Plaintiff's Further Promotional Opportunities

Icahn considered Beddoe as a candidate to replace Singh.  *Id.* ¶¶ 83-84.  Icahn asked Beddoe if she was interested in the dual-role position formerly filled by Singh.  *Id.* ¶ 85.  Beddoe responded that she was interested in the role of Institute Director, but not the role of Chairperson, due to her travel schedule and work with her global-health initiative.  *Id.* ¶¶ 86-87, 89.

On July 19, 2020, Beddoe applied for a new role as Director of the Blavatnik Family Women's Health Research Institute.  *Id.* ¶ 98.  Charney requested that the committee interview Beddoe.  *Id.* ¶ 99.  After she was scheduled for an interview for the position, Beddoe withdrew her application.  *Id.* ¶¶ 100-101; *see id.* ¶ 230.

### H. Plaintiff's Resignation

In May 2021, Icahn offered Beddoe another contract that would further reduce her salary as originally proposed in the Draft 2020 Contract.  *Id.* ¶ 62.  Beddoe rejected the offer and worked without a contract until she resigned in April 2022.  *Id.* ¶ 63.  Her salary was reduced in the manner originally proposed in the Draft 2020 Contract, effective May 1, 2021.  *Id.* ¶ 192.

## II.   Procedural History

Plaintiff filed a charge of retaliation with the Equal Employment Opportunity Commission (the "EEOC") on September 14, 2020, and the EEOC issued its Notice of Right to Sue on September 21, 2020.  *Id.* ¶¶ 211-212.  Plaintiff originally sought to join the claims asserted in this lawsuit with those asserted by other employees and ex-employees at AIGH in another case

currently pending in this District, *Safo v. Singh*, No. 19-cv-03779 (VSB). She attended a press conference with the plaintiffs in that litigation on September 30, 2020. Opp. SOF ¶ 214. Judge Broderick denied Beddoe's request to join the *Safo* litigation on January 14, 2022. *Atkinson v. Singh*, No. 19-cv-03779 (VSB), 2022 WL 137634, at *16-17 (S.D.N.Y. Jan. 14, 2022).

On April 13, 2022, Plaintiff filed the Complaint. Compl. Plaintiff originally brought this action against Defendants and Mount Sinai Health System, Inc. *Id.* On June 3, 2022, the parties stipulated to dismissal of all claims as asserted against Mount Sinai Health Systems, Inc., and the Court ordered dismissal of those claims. ECF Nos. 24-25. On the same day, Defendants answered the Complaint. ECF Nos. 26-27. On September 14, 2022, the case was reassigned to the undersigned. ECF No. 31. On July 21, 2023, Defendants filed the instant motion for summary judgment. Br. Plaintiff opposed the motion on August 18, 2023. ECF No. 80 ("Opp."). Defendants filed a reply in support of the motion on September 8, 2023. ECF No. 89 ("Reply"). The motion is now fully briefed and presently before the Court.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Id.*

At summary judgment, the court's task is simply to "discern[] whether there are any genuine issues of material fact to be tried, not to decid[e] them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for

7

the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997); *accord Rupp v. City of Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024). The court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

## DISCUSSION[2]

Plaintiff brings this action against Defendants for retaliation in violation of Title IX, Title VII, the NYSHRL, and the NYCHRL. Compl. ¶¶ 79-92. In the Complaint, Plaintiff alleged that after she voiced opposition to workplace discrimination against women, *id.* ¶ 85, Defendants retaliated against her when they refused to split up Singh's prior dual director/chairperson role and consider her candidacy for only the director-based portion of that position, *id.* ¶ 87, and when they progressively reduced her annual compensation, *id.* ¶ 88. After Defendants completed their opening briefing on this summary-judgment motion, "Plaintiff concede[d] her claims of retaliation based on the search process[]" for the director position. Opp. at 12 n.11. Thus, Plaintiff's only theory of retaliation before the Court is her claim that Defendants retaliated against her for opposing gender-based discrimination by progressively reducing her compensation. Specifically, Plaintiff claims that she engaged in such protected activities beginning in 2018 and continuing through 2020, and that her salary was then reduced starting in 2020. *See generally* Opp.

---

[2] Defendants request oral argument via notation on their briefs. Br.; Reply. The Court declines to hold oral argument because the parties' briefing was sufficient and oral argument would not materially assist the Court. *See Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005) ("[A] district court acts well within its discretion in deciding . . . motions on the parties' written submissions without oral argument.").

8

Defendants argue that summary judgment should be granted in their favor for two reasons. First, Defendants argue that Plaintiff cannot establish a *prima facie* case of retaliation because she cannot show a causal connection between her complaint and the reduction of her compensation. Br. at 10-13.  Second, Defendants argue that even if Plaintiff could establish a *prima facie* case, her claim would still fail as a matter of law because Defendants have proffered legitimate, non-retaliatory reasons for the challenged decisions, and there is no evidence from which a factfinder could draw a plausible inference of pretext.  *Id.* at 13-15.

## I. Legal Principles

Claims for retaliation brought under Title IX, Title VII, and the NYSHRL are analyzed under the familiar *McDonnell Douglas* burden-shifting framework.  *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (Title VII and NYSHRL); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91-92 (2d Cir. 2011) (Title IX).  To establish a *prima facie* case of retaliation under these statutes, "a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).  Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to offer a "legitimate, non-retaliatory reason for the adverse employment action." *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (citation omitted).  Once the defendant provides such an explanation, "the presumption of retaliation dissipates," *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005), and the burden shifts to the plaintiff to show that the employer's explanation was pretextual, *Kwan*, 737 F.3d at 845-46.  The plaintiff must then show "that the desire to retaliate

9

was the but-for cause" of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *accord Carr*, 76 F.4th at 178.

Claims for retaliation brought under the NYCHRL must be analyzed "separately and independently from any federal and state law claims," as claims brought under the NYCHRL are "uniquely broad." *Mihalik v. Credit Agricole Chevreux N.A., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). To sustain a claim for retaliation under the NYCHRL, a plaintiff "must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* at 112 (citation omitted).

## II. Title IX, Title VII, and NYSHRL Claims

The Court assumes without deciding that Plaintiff has established a *prima facie* case of retaliation based on the reduction of her compensation beginning in 2020 after her complaints regarding discrimination, and that the burden has thus shifted to Defendants to proffer a legitimate, non-discriminatory reason for the adverse employment action. Here, Defendants have proffered such a reason: Beddoe's lack of revenue generation and productivity as measured by her declining RVUs. *See, e.g.*, *Abromavage v. Deutsche Bank Sec., Inc.*, No. 18-cv-06621 (VEC), 2021 WL 1061596, at *10 (S.D.N.Y. Mar. 19, 2021) (plaintiff's declining productivity in terms of revenue was legitimate, non-retaliatory reason for adverse employment actions), *aff'd*, No. 21-668, 2022 WL 4360950 (2d Cir. Sept. 21, 2022) (summary order). Because Defendants have proffered a legitimate, non-retaliatory reason for the reduction in Plaintiff's annual compensation, the burden shifts back to Plaintiff to show that Defendants' proffered legitimate reason is pretextual for retaliation, and that retaliation was the but-for cause of the adverse employment action. *See Carr*, 76 F.4th at 178; *Abromavage*, 2022 WL 4360950, at *1. Here, Plaintiff has

cited to no evidence that would allow a reasonable factfinder to conclude that she has met this burden.

In her opposition brief, Beddoe offers only one reason in support of her argument that the Defendants' proffered legitimate reason to decrease her compensation is pretextual for retaliation. According to Beddoe, her employer offered conflicting explanations for her salary decrease, because the Department's Vice Chair of Administration, "Berdebes, who was consulted and 'on board' with the proposed salary decrease . . . gave conflicting reasons for the decision to Dr. Beddoe." Opp. at 25. Plaintiff argues that Berdebes first informed her that her 2020 salary cut was because she would no longer serve as Director of Gynecologic Oncology Chemotherapy Infusion Service, but when Beddoe "challenged" her, Berdebes said that "maybe it was to do with monies brought in." *Id.* (brackets omitted) (citing Opp. SOF ¶¶ 168, 170). It is true that an employer's inconsistent explanations for an adverse employment action may defeat an employer's summary judgment motion based on pretext. *See Kwan*, 737 F.3d at 847. Here, however, there is no evidence that Berdebes was the decision-maker with respect to Beddoe's salary cut. Indeed, Beddoe testified unequivocally that Berdebes "did not determine [her] salary" in 2013, 2017, or 2020, but simply "gave [her] forms to sign." ECF No. 82-1 ("Beddoe Tr.") at 34:11-21. Beddoe testified instead that "Charney determined [her] salary." *Id.* at 34:24-25. Beddoe's acknowledgment that Berdebes did not determine her salary, but simply provided employment forms for her to sign, is also consistent with Berdebes' position as an administrator in the Department. *See* Opp. SOF ¶ 45. Finally, although Beddoe states in her opposition brief that Berdebes was "consulted and 'on board'" with her salary decrease, the evidence cited by Plaintiff does not suggest that Berdebes was the decision-maker as to her salary decrease. Opp. at 25

11

(citing Opp. SOF ¶¶ 168, 170).  Thus, Plaintiff has not identified any inconsistent explanations from any decisionmaker with respect to her compensation.

Beddoe also argues that Defendants' proffered reason is not legitimate because her "compensation was fixed" and "RVUs were not applicable to [her] compensation." *Id.* at 23.  But these assertions do not create a genuine dispute of material fact.  There is no dispute that Beddoe's annual compensation consisted of a fixed salary.  *See* Reply at 10; *see also* ECF No. 82-8 at 228:3-6 (Licari testifying that "[s]ome doctors are paid based on RVUs, some doctors are paid based on their income, and some doctors are paid a fixed salary like Dr. Beddoe"); Beddoe Tr. at 190:5-10 (Plaintiff testifying that "[s]ome physicians[']  . . . income is based on RVUs.  Mine wasn't . . . [My] compensation was fixed . . . *during the term of a contract*" (emphasis added)).  That Beddoe's compensation was fixed annually does not mean that performance metrics like RVUs were not used to negotiate and fix that compensation.  Defendants have presented evidence that they used revenue generation and productivity metrics to determine Beddoe's annual salary under the 2017 Contract and the Draft 2020 Contract.  *See, e.g.*, Opp. SOF ¶¶ 25, 37.

Beddoe has not provided any contrary evidence.  She cites testimony from Licari, the Department's Director of Finance, stating that her compensation was "not tied to [her] revenue," and similar testimony from her own deposition.  Opp. at 23 (citing Opp. SOF ¶ 134).  But read in context, the testimony indicates only that her compensation was fixed annually by contract term, which is not in dispute.  *See* ECF No. 82-8 at 228:3-6 (Licari's testimony, quoted above); Beddoe Tr. at 190:5-10 (Plaintiff's testimony, quoted above).  Thus, Plaintiff's statements that RVUs were irrelevant to her compensation are not supported by the record.  Therefore, no reasonable

juror could find that Defendants' stated reliance on RVUs and performance metrics to decrease her salary is pretext for retaliation.

Supporting Defendants' contention that Beddoe's compensation was determined by productivity metrics instead of retaliation, Icahn reduced Beddoe's salary for the first time significantly in 2017, *before* Beddoe first voiced her opposition to gender-based discrimination in 2018. *See* Opp. SOF ¶ 25. Defendants point out, and Plaintiff does not contest, that the reduction in her annual compensation in 2017 (from $566,399 to $432,912, a twenty-four percent reduction) was far steeper than the reduction offered to her in 2020 (from $432,912 to $385,488, an eleven percent reduction). Br. at 14. The later reductions in her compensation beginning in 2020 were therefore part of a progressive series of reductions in her compensation that predated her protected activity. *See Woolf v. Bloomberg L.P.*, No. 16-cv-06953 (PKC), 2019 WL 1046656, at *19-20 (S.D.N.Y. Mar. 5, 2019) (no reasonable factfinder could conclude that Defendants' legitimate reason for adverse employment action was pretextual where employee received negative feedback that predated any protected activities and then later received similar negative feedback that resulted in termination), *aff'd*, 949 F.3d 89 (2d Cir. 2020); *Shah v. Consol. Edison Corp. of N.Y.*, 175 F. App'x 436, 438 (2d Cir. 2006) (summary order) (affirming summary judgment in favor of employer where an adverse employment action "simply reflected a continuation of negative assessments of [plaintiff's] performance that traced back to before [plaintiff's protected activity] and before [plaintiff's] supervisors were aware of any protected activity"). Plaintiff asserts that the large reduction in her salary in the 2017 Contract was because "she assumed the role of System Director of Global Health," taking time away from her clinical activities. Opp. at 23. However, this additional reason for reducing Plaintiff's compensation in 2017 does not undermine

13

Defendants' assertion that Beddoe's compensation was based on productivity metrics as well as the roles that she held, rather than on any purported retaliation by Defendants.

Insofar as Beddoe takes issue with the way Defendants calculated her RVUs and otherwise billed for her work, *see id.* ("to the extent that Defendants' records placed Plaintiff's productivity as literally zero as Defendants claim, this was not a function of Dr. Beddoe's job performance but rather of Defendants' selective record-keeping"), Defendants' method of record-keeping for Beddoe's services was established in 2017, *see* Opp. SOF ¶ 31, before Beddoe's first protected activity occurred in 2018. This timing negates any inference that Defendants employed "selective record-keeping" in furtherance of a retaliatory scheme against Plaintiff.

It further does not matter whether Defendants' legitimate, non-retaliatory reason to reduce Plaintiff's compensation was well-advised, sensible, or consistent with Plaintiff's understanding of the value of her employment. *See Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("[T]he reasons tendered need not be well-advised, but merely truthful."). "[C]ourts have consistently held that they may not second-guess an employer's non-[retaliatory] business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by [retaliation]. Federal courts do not hold a roving commission to review business judgments." *Peters v. Mount Sinai Hosp.*, No. 08-cv-07250 (CM), 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010); *accord Abromavage*, 2021 WL 1061596, at *13. "[A]n employee's quarrel with an employer's decision does not undercut the legitimacy of the rationale for the decision, nor does it establish pretext." *Abromavage*, 2021 WL 1061596, at *13.

In *White v. Pacifica Foundation*, the court analyzed facts analogous to those relevant here. 973 F. Supp. 2d 363 (S.D.N.Y. 2013). There, the employer proffered that the employee was terminated because, among other things, the employee had not met certain performance metrics.

14

*Id*. at 382.  The employee argued that those reasons were "pretextual because [the purported decision-maker] is not familiar with [those specific performance metrics], and therefore it is highly doubtful that [the decision-maker] came to the conclusion and made the decision by herself to [take the adverse employment action]."  *Id.* (original brackets and quotation marks omitted).  The court granted summary judgment in favor of the employer on the employee's discrimination claim because disagreeing with an employer about how to understand performance metrics "or otherwise rationalizing . . . problems legitimately perceived by an employer does not establish pretext."  *Id.* (brackets omitted); *see id.* at 386 (also granting summary judgment in favor of employer on employee's retaliation claim because employee failed to establish a *prima facie* case of retaliation).  Here, too, it does not matter that Beddoe disagrees with how Defendants applied performance metrics to determine her annual compensation.  Defendants have proffered evidence showing that they reduced Beddoe's annual compensation based on her revenue generation and productivity based on RVUs; neither her conclusory allegations that this was not the basis for her pay cut nor her disagreement with that business decision can establish pretext.[3]

There is therefore no question of fact from which a reasonable jury could conclude that Defendants' legitimate, non-retaliatory reason to decease Beddoe's compensation was pretextual.

---

[3] In her opposition, Beddoe implies that the further reduction to her salary in 2021 constitutes a separate act of retaliation by Defendants.  *See* Opp. at 14-15 (describing the salary reduction in 2021 as a "further salary reduction").  Because Beddoe's salary was reduced in 2021 by the same amount as proposed under the Draft 2020 Contract, Defendants' same non-retaliatory reason for Beddoe's salary reduction in 2020 applies to the salary reduction in 2021.  Opp. SOF ¶¶ 46-47, 192.  Even if the 2021 salary reduction constitutes retaliation separate from the 2020 salary reduction, Defendants, for the reasons stated above, articulated a legitimate, non-retaliatory reason to reduce Beddoe's compensation, and Beddoe has not pointed to any facts from which a reasonable jury could find that the proffered reason was pretext for retaliatory animus, and that retaliation was a but-for cause of the compensation reduction.

15

Thus, the Court enters summary judgment in favor of Defendants on Plaintiff's retaliation claims brought under Title IX, Title VII, and NYSHRL.

### III. Plaintiff's NYCHRL Claim

Having granted summary judgment to Defendants on Plaintiff's federal and state law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining city law claim. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction.").

As the Supreme Court has observed, and as echoed by the Second Circuit, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see Dhar v. N.Y.C. Dep't of Transp.*, 630 F. App'x 14, 16 (2d Cir. 2015) (summary order) (holding that the "district court did not abuse its discretion when it declined to exercise supplemental jurisdiction over [the plaintiff's] NYCHRL claim" after granting summary judgment in favor of the defendants and dismissing the plaintiff's federal-law claims). The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claim, thus avoiding deciding issues of New York City law that are better suited for the state courts of New York. Accordingly, Plaintiff's remaining NYCHRL claim is dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's Title IX, Title VII, and NYSHRL claims. Plaintiff's NYCHRL claim is

16

dismissed without prejudice. The Clerk of Court is respectfully directed to CLOSE the motion pending at ECF No. 71 and to CLOSE the case.

Dated: March 7, 2024
      New York, New York

SO ORDERED.

*Jennifer Rochon*
JENNIFER L. ROCHON
United States District Judge